UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Scott D. Grigsby<br>3045 Azure Cove<br>Aurora, IL 60503<br><br>    Plaintiff,<br><br>    v.<br><br>Mark T. Esper<br>Secretary of the Army<br>101 Pentagon<br>Washington DC 20310-0101<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  CA No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

This is a non-monetary claim to set aside the decision of the Army Board for Correction of Military Records [BCMR] #AR 2012-002096 (June 29 2013), denying plaintiff's request to remove a Memorandum of Reprimand [MOR] imposed June 28, 2011, from his personnel files.

### JURISDICTION AND VENUE

Jurisdiction is conferred under the Administrative Procedure Act, U.S.C. § 702.

Venue is proper as the Defendant is found in this District.

### PARTIES

Plaintiff, Scott D. Grigsby, is a former Colonel (0-6) in the United States Army Reserve, transferred to the Retired Reserve October 1, 2009.

Defendant, Mark T. Esper, in his capacity, is the Acting Secretary of the Army.

### FACTS

1. In September 2001 Lieutenant Colonel Grigsby, an officer in U.S. Army Reserve, entered active duty.   In 2005 he promoted to Colonel (COL) grade 0-6.

2. In 2005, COL Grigsby was assigned to create as the new Director of the "Warrior & Family Assistance Center [WFAC]," in the United States Army Reserve Command [USARC], Fort McPherson, GA.[1] In this unit USARC, his commander was Lieutenant General [LTG] Stultz, Chief of the Army Reserve. Grigsby's immediate supervisor was Major General [MG] Eder, Deputy Chief and Deputy Commander of the Army Reserve.

3. In 2007 a larger organization within USARC was created called the "Army Reserve Family Programs Directorate" (ARFPD). This began reorganizing to include subordinate program directors, coordinators, and family readiness support assistants throughout the Reserve community in the United States.[2] From 2007 to 2009 various Army officers temporarily served as Acting or Interim Directors of AFRPD until there was a permanently assigned DA Civilian director trained on administering government contracts (Dep't of Army Civilian employee).[3]

4. <u>Col Grigsby as Interim Director AFRPD</u>. In May 2008 the WFAC directorate was incorporated within ARFPD. COL Grigsby from May through October 2008, while still serving as WFAC Director, temporarily assumed additional duties as ARFPD Interim Director. LTG Stultz and MG Eder were COL Grigsby's supervisors, and designated "rating officials" for his Officer Evaluation Report [OER]. COL Grigsby was

> selected to serve as the interim director....due to his unqualified success as Director of [WFAC] ...he built that program from scratch and his performance...exceptional. * * * [He] was the obvious choice for the tough job as Director [ARFPD] because of his leadership skills and his passion for taking care of Soldiers and Families.

---

[1] WFAC is a transition program for wounded Reservists on active duty during Operation Enduring Freedom (Afghanistan) and Operation Iraqi Freedom; it provides patient and family member services during rehabilitation.

[2] https://www.arfp.org/about/

[3] DA Civilians are federal civil service employees within the United States Army Civilian Corps. <u>See, generally.</u> http://sill-www.army.mil/usag/Army%20Civilian%20Corps%20New%20Employee%20Handbook.pdf

OER May-Nov 2008, Rater Part Va, MG Eder, Senior Rater Part VIIc, LTG Stultz.

     5. In October 2008, COL Grigsby received an outstanding OER as interim director. The OER rater marked the highest block "Outstanding Performance Must Promote" with narrative comments performance - "exceptional...led the program forward in an ambitious manner that sets stage for future success....unlimited potential." OER Part Va, b, c.  The senior rater marked the highest block for promotion potential "Best Qualified," and in the potential box compared to peers "Center of Mass," with narrative comments "a true leader, visionary and Soldier's Soldier ... continue to be assigned to positions that focus on Soldier and Family care." Id Part VII a,c.

     6. <u>Nov 2008; reassigned back to duties as Director, WFAC</u>. From November 2008 to June 2009, other officers served as interim directors of AFRPD. COL Grigsby resumed his duties as WFAC Director. In March 2009, COL Grigsby received an outstanding OER as WFAC director. The OER rater was Brigadier General [BG] MacDonald, Chief of Staff, Army Reserve, marking the highest block "Outstanding Performance Must Promote," with narrative comments "possess unlimited potential."  The senior rater was MG Bell, the Deputy Commander of the Army Reserve, and also serving as Deputy Commanding General (ORT&M) [Operations, Readiness, Training, and Mobilization].  MG Bell marked the highest block for promotion potential as "Best Qualified," and in the potential compared to his peers marked "Center of Mass," with narrative comments including —

> top performance of any Colonel in this headquarters...contributed tremendously...built framework for manning, funding, and obtaining the structure to make the AR-WFAC an enduring organization.

Id Part VII a,c.

7. In July 2009 COL Grigsby received another OER as WFAC director, his last due to his impending retirement. This outstanding evaluation capped Colonel's Grigby's 30 years of Army service. The rater and senior rater were both MG Bell, Deputy Chief and Deputy Commander of the Army Reserve, marking "Outstanding Performance Must Promote," and as senior rater highest block for promotion potential "Best Qualified," and in the potential box compared to peers "Center of Mass." Narrative comments were "recognized as a leader above and beyond." Colonel Grigsby then departed on transitional leave prior formal retirement.

8. On October 1, 2009, COL Grisgby was honorably released from active duty and retired, completing sufficient service for 'non-regular' or Reserve retirement.

**In 2009 management of retired regular & reserve soldiers transfers from Chief of Army Reserve to Commanding General, U.S. Human Resources Command (active Army unit)**

9. Upon retirement of Regular Army and Reserve soldiers, the authority for further peacetime management, including recall for mobilization or involuntarily for discipline, was transferred in 2009 from the Chief of Army Reserve to the regular Army under "Commanding General, U.S. Human Resources Command." Army Reg. 601-10 (2009) ¶ 1-1 (governs peacetime management and recall for "national emergency, mobilization... or in the interest of national defense, or as otherwise provided by law."); ¶ 1-4 *Responsibilities* ("Commanding General, HRC will...provide all management of retired soldiers...[maintains information, screening, management system, recall]"); Chap 5 (Commanding Genral, HRC processes retired soldiers failing to report to active duty as deserter, "drops from the rolls").

10. This edition of Army Reg. 601-10, still in effect, implements Department of Defense Directive 1352.1 *Management, Mobilization of Regular and Reserve Retired Military*

*Members* (1990), ¶ 6.3.3 governs involuntary order to active duty (order retired regular or reserve members without consent in the interests of national defense or as subject to the UCMJ).

11. Prior to the 2009 issue of Army Reg 601-10, authority for all peacetime management of regular and reserve soldiers was the "Chief of the Army Reserve." Id. (1994) ¶ 1-4 *Responsibilities* (Chief, Army Reserve will ... provide for the management of retired Army military personnel, ensure maintenance of information, screening); Chap 4 (Commander [Army Reserve Personnel Center] processes retired soldiers failing to report; drops from the rolls).

**2010 Investigation of contracting improprieties at ARFPD (June 2008-June 2009)**.

12. In 2010 BG William Gothard was assigned to USARC, becoming the Deputy Commanding General of the Army Reserve (Support) and Chief of the Staff for Army Reserve. He was previously Commanding General of the 353rd Civil Affairs command, Staten Island, New York.[4]

13. In August 2010, BG Gothard appointed an investigating officer ["IO"] to look into whether services procured from a civilian company (Odyssey), under a previous WFAC contract, continued beyond the scope of that contract after WFAC was incorporated within ARFPD.

14. The investigation was completed on November 19, 2010. The IO determined that -

ARFPD could not piggy-back on the pre-existing WFAC Odyssey contract because the new services required were not part of the original contract and the scope of work was substantially different. ARFPD should have drawn and requested approval for a new contract prior to requesting the services.

Investigation at 2, *Analysis #1*.[5]

---

[4] https://www.army.mil/article/39883/brig_gen_william_gothard_visits_81st_rsc_fort_jackson_schttps. and see https://www.dvidshub.net/news/130508/everything-season-wildcat-deputy-commander-retires

[5] Under the pre-existing contract, WFAC managed the particular project/program while Odyssey provided supplies, storage, inventory, shipping, and graphic design. These services continued in June 2008 but appears that Odyssey assumed some management duties. Id *Analysis #1b*.

15. The investigation of the Odyssey contract covered the time period June 2008 to June 2009. At that time a permanent, DA Civilian became the AFRPD Director, trained in oversight of government contracts. Id 4 *Analysis #2*. Prior to that time there were 5 interim directors, all who were Army officers. BCMR decision at 2 ¶ 2 (Grigsby application statement).

16. The IO found that COL Grigsby in his existing capacity as WFAC director was the requesting/approving authority for WFAC contract actions. Then from May to October 2008 when he additionally assumed duties as ARFPD acting/interim director, automatically became the requesting/approving authority for ARFPD contract actions.  Furthermore —

> Whether he implicitly, explicitly, or by leadership default exercised his authority is in question; but irrespectively, he was the Interim Director at the time and was ultimately responsible for all contract actions under his directorate.

Id, at 3, *Finding 1c*.

17. In the investigative report's 'analyses,' the IO stated that in the Investigating Officer's opinion —

> Odyssey provided services to ARFPD from June 2008 - June 2009 without a valid/ authorized contract...AFRPD was a directorate in flux with constant personnel turnover, lacking leadership and Director's contracting oversight until [the permanent Director] assumed duties on 29 May 2009.
> * * *
> Failure to draw a new contract...was probably due in part to lack of training/expertise dealing with government contracts; possible undue supervisory influence to get the services done; or reaction to failing to timely request funding in a budget cycle year.
> * * *
> COL Grigsby did not know he was solely responsible for directing/authorizing services.
> * * *
> Neither COL Grigsby nor [his subordinate AFRPD civilian contracting representative] were fully aware of the requirements for entering a contract before authorizing [these] services from Odyssey.

Investigation at 4-6, *Analysis #2, #.2b, # 2c(2), (3)*.

-6-

18. Among the IO's recommendations were —

(b) USARC ensure all Directors and their Deputies, dealing with, or overseeing contracts, are properly trained on their duties and responsibilities ...before taking over their positions, even if they are under on an Interim or Acting status.
* * *
(d) I do not recommend a Commander/Supervisor take any form of disciplinary action against COL (Ret) Grigsby. Although utterly reprehensible in lack of oversight and leadership while serving as Interim Director....[his] actions do not merit further USARC involvement. The incident did not come to light until COL Grigsby had long retired and regrettably the time lapse and memory recollection of the events by those involved is vague, sometimes contradictory, or selective. In the investigating officer's opinion, it is too late now for any meaningful personal accountability or punitive action that could not be successfully legally contested given the conflicting memory recollection of those involved..... the vague depositions of all others in the case do not support delayed disciplinary action * * * ...*two years removed from the date of occurrence*.

Investigation at 12-13 [emphasis added].

19. With respect to the above emphasized italicized language from the IO's recommendation, the following are pertinent —

- 10 U.S.C. § 843(b)(3)(military members not liable for offenses more than two years before imposition of non-judicial punishment under "Article 15," 10 U.S.C. § 815)

- Army Regulation. 600-20 Army Command Policy (2006) Ch 4, *Military Discipline*

    - ¶ 4-6, (military authority must be exercised promptly, firmly, courteously and fairly; care should be taken at all levels of command to ensure that administrative corrective measures "are not used in an oppressive manner to evade the procedural safeguards of imposing non-judicial punishment");

    - ¶ 4-7 (disciplinary powers are outlined in Manual for Courts-Martial, Army Reg. 600-37, Army Reg. 635-200 [*Administrative Separation*] and other authorities).

- Army Reg. 600-37 Unfavorable Information incorporates standards of from the Privacy

Act 5 U.S.C. § 552(e)(maintain agency records with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual);

- Army Reg. 600-37 ¶ 1-1 (*Purpose*)(2)(ensure unfavorable information that is unsubstantiated, irrelevant, untimely, or incomplete is not filed); (3)(ensure the best interests of both the Army and the soldier are served by filing or removing unfavorable);

- Id ¶ 1-4 (*Objectives*)(apply fair and just standards to soldiers; protect the rights of soldiers and at the same time permit the Army to consider all available relevant information)

- Id ¶ 3-2*b* (*Policies*)(unfavorable information filed in personnel files must meet Privacy Act standards of accuracy, relevance, timeliness, and completeness (see AR 340–21)).

20. On March 21, 2011, BG Gothard approved the IO's recommendations with some exceptions.  BG Gothard disapproved the IO recommending that because it is too late, no form of any disciplinary be taken against COL (Ret) Grigsby.  BCMR at 5 ¶ 9.

June 2011 Reprimand of Col (Ret) Grigsby by BG Gothard, USARC.

21. On June 2, 2011, BG Gothard emailed to the home and civilian employer of Colonel (Ret) Grigsby, a Memorandum of Reprimand [MOR] for egregious conduct and incompetence as ARFPD interim director.  The MOR stated, in part —

> I hereby reprimand you for reprehensible and egregious lack of oversight and leadership while serving as the Interim Director for the ARFPD from May until October 2008. During your time as Director, the ARFPD entered into an unwritten/unapproved contract...for various services and you failed in your duties as the requesting/approving authority....Such incompetence is unacceptable and will not be tolerated.
> * * *
> I am gravely disappointed your actions ....
> * * *
> I impose this reprimand as an administrative measure and not under the provisions of Article 15 [UCMJ].  However, you should not consider this fact an indication of my

tolerance for your actions. I am considering filing the reprimand in your OMPF [6] ....you have the right to submit matters in defense, rebuttal, extenuation, and mitigation....

22. On June 7, 2011, COL (Ret) acknowledged receipt of the MOR. Generally for purposes of the complaint, Col Grigsby's rebuttal, dated 7 June 2011, requested the reprimand not be placed in his permanent record, disagreed with the investigation and the adverse characterizations in the MOR.

23. On June 28, 2011, BG Gothard reviewed the reply and directed the MOR be permanently filed in COL Grigby's OMPF, currently referred to as the AMHRR.[7]

2013 BCMR appeal and decision

24. In 2012, COL (Ret.) Grigsby applied to the BCMR to remove the MOR from his Army personnel record. He believed the MOR smeared his military reputation after retiring after 30 years of otherwise unblemished, excellent Army service. It further stigmatized him in the civilian community by openly emailing the reprimand directly to his new civilian employer.

25. In COL (Ret.) Grigby's BCMR appeal statement, he argued the MOR was not imposed promptly, fairly, or courteously. He disputed the misleading approach of the investigation, and the overblown characterizations in the investigation and MOR. He contended that there were four other "interim directors" to choose from, but BG Gothard needed a convenient scapegoat, and new to USARC Colonel Grigsby an easy target - BG Gothard was a stranger to Grigsby's duty performance during this time, and as long retired had faded recall from fairly answering the reprimand —

---

[6] OMPF Official Military Personnel File.

[7] AMHRR Army Military Human Resource Record.

> The reprimand was uncalled for.....Several of [my] phone calls to the BG [Gothard's] office and Staff Judge Advocate were rudely received....The reprimand itself was sent via email to [my] home email address and my business email. This entire matter was handled in a mean-spirited manner unbecoming of the USARC that [I] faithfully served.
> * * *
> Contrary to the statement of the IO, there were dozens of contracts that [I] reviewed during this time period as the USARC Family Programs encompassed units all around the world. The contract in question was purposely kept from [me], the facts were presented vaguely, and the underlying truth is that this contract actually came into being before [I] became the acting director and continued well after [I] left. [I] never signed a single document nor approved a payment or increase in services and, in fact, the wool was pulled over [my] eyes and the eyes of the other four acting directors. However, [I] was singled out as an easy target the only one issued a reprimand since [I] was the only retired one at the time of the investigation ...
> * * *
> A scapegoat was needed and pinned on [me] since [I] was the easiest target. The facts surrounding the incident did not call for a reprimand to be issued....nor to be filed in [my] permanent record. After 30 proud years serving [my] country selflessly, the only "REPRIMAND EVER" issued to [me] came about...after retired and based on an incident in which [I] was "NOT" complicit. An injustice has been committed on the part of those in desperate need to "pin the blame on someone...."  purge this error from [my] records.

BCMR decision at 1-2 ¶ 2 ("The applicant states:" ).

26. In the BCMR's consideration of Colonel Grigby's appeal, the Board applied the Army Regulation 600-37. This regulation governs the provisions for issuing administrative reprimands, and permanent filing in the soldier's records. The BCMR stated in part, the provisions from ¶ 3-4(a), (b), as follows —

> [P]rovides that an administrative reprimand may be issued by an individual's commander, by superiors in the chain of command, and by any general officer or officer exercising general court-martial jurisdiction over the soldier. ...[describing rebuttal procedures]
> * * *
> an administrative reprimand may be filed [permanently]....only upon the order of a general officer-level authority...

BCMR at 7, ¶ 16-17.

27. The relevant provisions of Army Reg. 600-37 (1987) *Unfavorable Information*, are

-10-

as follows in pertinent part, taken directly from the text:

> 3–4. **Filing of nonpunitive administrative letters of reprimand, admonition, or censure in official personnel files.**
>
> a. Filing in the military personnel records jacket (MPRJ).[8] Authority to issue and direct the filing of letters of reprimand....
>
> (1) of enlisted soldiers... restricted to—
>
> (a) the recipient's immediate commander (or a higher commander *in his or her chain of command*), school commandants, *any general officer* (to include those frocked to the rank of brigadier general) or an officer exercising general court-martial jurisdiction *over the recipient* ... *Immediate supervisors* of enlisted personnel also have authority....
>
> (2) of commissioned officers is restricted to—
>
> (a) The recipient's *immediate commander or a higher level commander in the chain of command* (if such commander is senior in grade or date of rank to the recipient).
>
> (b) The designated *rater, intermediate rater, or senior rater* under the officer evaluation reporting system....
>
> (c) *Any general officer* (to include one frocked to the rank of brigadier general) who is senior to the recipient or an officer who exercises general court-martial jurisdiction *over the recipient.*
> * * *
>
> b. Filing in OMPF. A letter.... may be filed in the OMPF..... only upon the order of a *general officer* who is senior to the recipient or by direction of an officer having general court-martial jurisdiction *over the recipient*.
> * * *
> (4) Be forwarded for inclusion in the performance portion of the OMPF only after considering the circumstances and alternative nonpunitive measures. ....Once placed in the OMPF, however, such correspondence will be permanently filed unless removed through the appeal process.
> * * *

---

[8] ¶ 3-4a(3). Filed in MPRJ is considered only 'local" or temporary at the current unit ("for a period not to exceed 3 years or until reassignment of the recipient to another general court-martial jurisdiction, whichever is sooner").

d. Circumstances affecting the imposition or processing of administrative letters of reprimand.

(1) When a *soldier leaves the chain of command or supervision* after a commander or supervisor has announced the intent to impose a reprimand, but before the reprimand has been imposed, the action may be processed to completion by the losing command.

(2) When the *reprimanding official leaves the chain of command or supervision* after stating in writing the intent to impose a reprimand, his or her successor may complete appropriate action on the reprimand. In such cases, the successor should be familiar with relevant information about the proposed reprimand.

(3) When a *former commander or supervisor* discovers misconduct warranting a reprimand, an admonition, or censure, he or she may—

(a) Send pertinent information to the responsible person's current commander for action.

(b) Personally initiate and process a letter of reprimand, admonition, or censure as if the former command or supervisory *relationship continued*. In such cases, further review (if needed) will be accomplished in the recipient's current chain of command. Officials should consider the timeliness and relevance of the adverse information before taking administrative action *at the later date*.

28.   The additional following provision of Army Reg. 600-37 is pertinent when considering whether to file unfavorable information —

3-1a(2) The knowledge and best judgment of the commander, board, or other responsible authority. (Both favorable and unfavorable information regarding the soldier concerned will be considered).

29. <u>**Overall intent of Army Reg. 600-37:  reprimand is relationship and time dependent**</u>

These requirements meet the Privacy Act fairness standard because they reasonably necessary to assure a reprimand is accurate, timely, relevant, and complete. Army Reg. 600-37 at ¶ 3-2*b*).

30.   <u>Reprimand is relationship dependent.</u> Reprimand requires a current or former duty relationship existed *vis-á-vis* a superior.  For both an officer and enlisted soldier, this is expressed in present or past tense language that describes duty or unit relationships that existed <u>between</u> the recipient and their superior.  This is emphasized in the aforementioned block quotes with italicized text.  For example, reprimand by the immediate commander or a higher level

-12-

commander *in* the chain of command. Or reprimand *by immediate supervisor*, or the *designated* rater, intermediate rater, or senior rater, or any senior general officer or officer exercising general court-martial jurisdiction *over* the recipient.

31. Moreover, subparagraph 3-4d (circumstances affecting the imposition or processing) drives home the intent in that reprimand relies on a superior who has, or had, an existing duty relationship over the recipient —

(a). For example, a successor may reprimand after the individual departed, only if the prior commander or supervisor *had announced an intent* but not yet reprimanded *before* the recipient left. Even if the *former* commander or supervisor failed to announced such intent, but later discovers misconduct, they can forward this pertinent information to the responsible person's current commander for additional review or action. This still requires that a prior command or supervisory relationship *had* existed.

(b). Alternatively, an individual still in the duty position be may reprimanded by the successor commander or supervisor only if the prior command or supervisor, *before they left,* stated in writing such intent.

(c). Even if the prior commander or supervisor did not announce an intent, such as when discovering misconduct after the responsible person left, they can still go ahead and personally reprimand. But this requires a prior command or supervisory relationship *had* existed over that individual. Furthermore, they are cautioned that Privacy Act standards apply whether untimely action remains fair and reasonable. This points to the overarching Army command policy that directing authorities be mindful of prompt discipline, in that "both unfavorable and favorable information" should be *during* the relationship. A.Reg 600-37 ¶ 3-1a(2). [9]

---

[9] Similarly, an existing or prior duty relationship is required under 10 U.S.C. § 815("Article 15") (among other punishments, commanding officer or successor may impose admonition or reprimand upon members *of his command*, upon other personnel *of his* command, or by an officer in charge upon enlisted members *assigned to the unit* [emphasis added])

32. <u>Reprimand is time dependent</u>.  The regulation additionally points to fairness with timeliness of a reprimand within 2 - 3 years of the misconduct.  Pertinent is Department of Defense Directive 1315.7 <u>Procedures for Military Personnel Assignments</u> (1987).[10]  Under DoD policy, reassignment follows these goals: after 36 months minimum Time on Station [TOS] within the continental United States, or after 24 to 36 months in overseas tours when civilian dependents accompany the soldier.[11]  Similarly, under A.Reg. 600-37(a)(3) a local reprimand not permanently filed is removed after "3 years or [when] reassignment of the recipient to another general court-martial jurisdiction whichever is sooner."  <u>See</u> U.S.C. § 843(b)(3) (not liable for offenses more than two years before imposing Article 15); Army Reg. 600-20 ¶ 4-6 (ensure that administrative discipline does not evade the procedural safeguards of Article 15).

<u>2011 reprimand of COL Grigsby lacks any duty relationship & untimely beyond 3 years</u>

33. When BG Gothard's reprimanded of COL Grigsby in June 2011, no prior or current duty relationship ever existed.  Gothard was never Grigsby's commander, never his supervisor or superior, and was never his OER rating official from May until October 2008.  Neither was Gothard a general officer or officer exercising general court-martial jurisdiction over COL Grigsby in USARC in 2008, nor even in 2011.  Moreover, in 2009 under Army Reg 601-10 the (2009) the officer exercising general court-martial jurisdiction over COL Grigbsy was the Commanding General, Human Resources Command.  And so, nor in 2011 did COL Grigby's former USARC commander, supervisor, rater, or even a former general officer over Grigsby in

---

[10] Replaced by DoDI 1315.18 (2015) with the same title.

[11] DoDD 1315.7 D(4), E (1987); <u>and</u> DoDI 1315.18 (2015) Encl 3(3), Encl 4(1)(a).

2008, send the investigation to this new HRC commander for action. Finally, nor in 2011 did COL Grigby's former USARC commander or supervisor - both general officers - personally reprimand him.

34. The latter two disciplinary actions referred to above, would have required the senior Deputy Commander MG Eder, and LTG Stultz, Chief of the Army Reserve, to contradict and amend their outstanding OER evaluations of COL Gribgsby when the AFRPD Interim Director as "exceptional...unlimited potential" and "a true leader, visionary," respectively. A.Reg. 623-3 (2007) ¶ 3–41 (will amend prior OER for newly received derogatory information unless none of the rating officials wants to change original OER). As this never occurred, with presumption of regularity attaching to the undisputed OER evaluation as the "considered opinions and objective judgment of the rating officials, and with senior LTG Stultz still the USARC Commander.[12] This discredits the MOR as inaccurate, untimely, and irrelevant.

35. The reprimand of COL Grigsby on June 28, 2011, for alleged misconduct from May through September 2008, occurred between 37 months to 33 months removed from the events, about half of it beyond 3 years. Even the interview of COL Grigsby by the investigating officer in November 2010, was over "two years removed," resulting in memory recollection that was "vague, sometimes contradictory, or selective." The 2011 Investigation Office implicitly recognized Grigsby was not liable under Article 15 for these events, and the lapse in time otherwise too late for meaningful accountability. As such, the IO recommended no discipline of any kind against COL Grigsby.

---

[12] Army Reg. 623-3 ¶¶ 3-39, 6-7, 6-11a(1)(presumption of regularity attaches to filed OER).

36. <u>2013 BCMR decision</u>. On June 29, 2013, the BCMR denied COL Grigby's request to remove the MOR from his personnel files. The Board ignored the overall intent of Army Reg. 600-37 that reprimands are relationship and time dependent —

> [A]fter a decision made by a general officer to file a reprimand . . . * * * [it] was properly administered in accordance with applicable regulations and is properly filed in the performance section of his AMHRR. There is no evidence of an error or an injustice.

BCMR Decision at 8 ¶¶ 3-4.

37. In disregard of the intent of Army Reg. 600-37, the 2013 BCMR decision effectively means that when these standards *do not exist* of a timely prior or current duty relationship, that any general officer may arbitrarily ignore the standards, including applicable standards from other A.Reg. 623-3, A.Reg. 600-20. If taken to its logical extent, this grants *cart blanche* to the agency to bypass all Privacy Act standards (as embodied within the above regulations) — any general officer can be borrowed from any unit anywhere in the Army, at any time, to then administratively reprimand a junior soldier, never the soldier's former or present commander, supervisor, rating official, superior, or general officer court-martial convening authority; and when the reprimand conflicts with the existing and undisputed outstanding evaluation of the soldier's conduct by more senior general officers and commanders; and finally when reprimand is over the objection of an investigating officer recommending it is "too late" for any commander or supervisor to discipline such soldier in any form. Yet, this is the appalling result here.

38. In late 2016 and 2017, undersigned counsel and plaintiff made several requests to USARC and other agencies for records under the Privacy and Freedom of Information Acts. This obtained the entire investigation file and all related records from 2010 to 2011.

39. COL (Ret) Grigsby now seek judicial review of the 2013 BCMR denial of his request to remove the 2011 memorandum of reprimand from his Army personnel files.

CAUSE OF ACTION

The 2013 BCMR denial of plaintiff's request to remove the 2011 memorandum of reprimand from his Army personnel files, violated the Administrative Procedure Act as arbitrary and capricious agency action, was unsupported by substantial evidence, not in accordance with law and Army regulation, or otherwise constituted an injustice.

PRAYER FOR RELIEF

That this Honorable Court declare that the Army BCMR's 2013 denial of plaintiff's request to remove the 2011 memorandum of reprimand from his Army personnel files, violated the Administrative Procedure Act as arbitrary and capricious agency action, was unsupported by substantial evidence, not in accordance with law and Army regulation, or otherwise an injustice;

That the Court order the Army to remove the 2011 memorandum of reprimand from his Army personnel files;

That this Honorable Court grant attorney fees.

March 29, 2018                              Respectfully Submitted,


                                            /s/  John A. Wickham
                                            DC Bar 454863
                                            32975 Saint Moritz Drive
                                            Evergreen, CO 80439
                                            303 670-3825 fax: 303 670-1586
                                            wickham1@wispertel.net

                                            Counsel for Plaintiff Scott Grigsby